COURT OF APPEALS

SECOND DISTRICT OF TEXAS

FORT WORTH

NO. 2-07-162-CV

IN THE INTEREST OF L.E.W., 

A CHILD 

------------

FROM THE 323RD DISTRICT COURT OF TARRANT COUNTY

------------

MEMORANDUM OPINION
(footnote: 1)

------------

I.  Introduction

After a bench trial, the trial court entered a judgment terminating Appellant Alisha Ford’s parental rights to her son L.E.W.
(footnote: 2)  In two points, Alisha challenges the legal and factual sufficiency of the evidence to support the trial court’s findings that termination was justified under family code section 161.001(1)(D) or section 161.001(1)(E) and was in L.E.W.’s best interest.  We will affirm.

II.  Factual and Procedural Background

A. Events Triggering CPS Involvement

Susan Rial, a former CPS investigator, testified that on January 3, 2006, she received a referral regarding allegations of physical abuse of four-month-old L.E.W. because doctors at USMD Hospital in Arlington had determined that L.E.W.’s ribs were fractured. 

Dr. Kerry Yancy, a specialist in pediatric emergency medicine at Cook Children’s Hospital, testified that USMD Hospital sent L.E.W. to Cook Children’s on January 4, 2006, for further evaluation of his fractured ribs.  Dr. Yancy stated that L.E.W.’s fifth, sixth, seventh, eighth, and ninth ribs on his left side were fractured, as well as the tenth rib on his right side.  Dr. Yancy said that L.E.W’s fractured right rib was healing but that the fractured left ribs were not healing, which Dr. Yancy interpreted to mean that the injuries to L.E.W.’s right side occurred at a different time than those to his left side. 

Alisha told Dr. Yancy that L.E.W. had fallen off a low bed, but Dr. Yancy testified that a fall from a low bed would not generate sufficient force to fracture a child’s ribs.  Dr. Yancy testified that rib fractures, like the ones she saw on L.E.W., often result from a squeezing force applied to a baby’s chest.  Dr. Yancy said that x-rays taken while L.E.W. was at Cook Children’s revealed that L.E.W. also had a spiral fracture in his right tibia.  Dr. Yancy said that she was concerned for L.E.W.’s safety because no plausible explanation had been given for L.E.W.’s rib fractures or the spiral fracture in his leg. 

That same day—January 4, 2006—Rial received a referral from Cook Children’s Hospital stating that L.E.W. had multiple rib fractures.  Rial went to Cook Children’s with Detective Hubbard from the Arlington Police Department.  Upon her arrival, Rial found L.E.W. sleeping in the emergency room waiting area, so Rial joined the detective who was interviewing L.E.W.’s mother, Alisha. 

Alisha initially told Rial and Detective Hubbard that she did not know how L.E.W. had sustained the rib fractures.  Alisha later said that L.E.W. had fallen off the bed several days prior to their trip to the hospital.  Detective Hubbard told Alisha that she had seen the bed
(footnote: 3) and that it was not high enough off the ground to cause L.E.W.’s injuries.  Alisha did not provide any alternate explanation for L.E.W.’s injuries at that time. 

As Rial interviewed Alisha, she learned that Alisha was sixteen years old, attending high school, living with her father and brothers in Arlington, and spending a lot of time with L.E.W.’s father, James, and with James’s family.  Rial discovered that several people had spent time alone with L.E.W., but Alisha did not indicate to Rial that L.E.W. had been left in the care of anyone else. 

Alisha explained that she had noticed on Saturday (December 31, 2005) that something was wrong with L.E.W., but she did not take him to the doctor then because she was at James’s home and did not have her Medicaid card.  Alisha went to school on Tuesday (January 3, 2006) and received a call from the daycare stating that L.E.W. was crying and could not be comforted.  Alisha said that she took L.E.W. to USMD Hospital in Arlington that night because he had been exceptionally fussy, because his ribs “felt funny,” and because her aunt had told her to take him to the doctor. 

When Rial interviewed James, he initially said that he had no idea how L.E.W.’s injuries had occurred.  James then said that L.E.W. had fallen off a toddler bed.  When Detective Hubbard and Rial responded that a fall from a toddler bed could not have caused L.E.W.’s injuries, James did not immediately supply another explanation for L.E.W.’s injuries.  Later, he said that he had come home one night and found his brother Brian shaking L.E.W. and telling him to be quiet.  James said that he “had words” with his brother, told him to stop, and went and woke up his grandmother, who whipped Brian and sent him away.  James said that Alisha knew about this incident, but when questioned, Alisha denied knowing of the incident and claimed that everyone had been asleep when she and James had arrived home that particular evening.

L.E.W.’s x-rays revealed that the spiral fracture of his right tibia and his various rib fractures were in different stages of healing:  the spiral fracture to the tibia was approximately fourteen days old, and the rib fractures ranged from seven to ten days old.  When Rial received this additional information about L.E.W.’s injuries and told Alisha and James about it, both Alisha and James appeared surprised to learn about L.E.W.’s broken leg and gave no explanation for the different time frames for the broken bones. 

Rial later learned from Alisha’s father that Alisha and James had argued during the holidays, that L.E.W. was involved, and that Alisha and James “were rough” on L.E.W.  Rial questioned Alisha, and Alisha said that James had jumped on the bed and on L.E.W. and that they had argued.  

Based on the information that she gathered, Rial performed a risk assessment and made the following findings.

Child Vulnerability — Considerable risk.  L.E.W. was only four months old and could not talk to let people know whether he was in danger.  Additionally, there were many people in contact with him during the time that his injuries occurred. 

Caregiver Capability— Considerable risk.  James admitted that he had an anger problem, a history of school suspensions and tickets, and an arrest for fighting and assault.  Both Alisha and James admitted that they had smoked marijuana and that they had been abused or neglected as children. 

Quality of Care — Considerable risk.  Rial noted that it was possible that L.E.W. had been left with someone who had injured him and that neither parent had sought medical help after noticing the problems with L.E.W.’s ribs and his fussy behavior. 

Maltreatment Pattern — Considerable risk.  L.E.W. had six rib fractures and a spiral fracture of his tibia, which had occurred earlier than the rib fractures. 

Home Environment — Somewhat of a risk.  James admitted that he has an anger management problem and frequently fights and that his siblings have similar issues.  

Social Environment — Somewhat of a risk.  James had a criminal record. 

Response to Intervention — Somewhat of a risk.  James gave what appeared to be a dishonest account of how L.E.W. was injured, and neither parent came forward with a plausible explanation for L.E.W.’s injuries. 

Rial testified that the allegations against Alisha and James regarding neglectful supervision and physical abuse of L.E.W. were ruled “unable to determine.”  However, the allegations against Alisha and James regarding medical neglect of L.E.W. were ruled “reason to believe,” and the allegations of physical abuse of L.E.W. by an unknown perpetrator were ruled “reason to believe” because Alisha and James failed to give a plausible explanation for L.E.W.’s injuries and said that he had been exposed to numerous individuals during the time frame that his injuries were inflicted.  Based on these findings, Rial decided to place L.E.W. in CPS custody.

When Rial told Alisha and James that L.E.W. was being placed in CPS custody, they were cooperative.  Rial transported L.E.W. from the hospital to his foster parent’s house and said that L.E.W. appeared to be in a great deal of pain.  

Rial testified that L.E.W. cried a lot when he was transported to the visits with Alisha and James.  During the visits, neither Alisha nor James followed Rial’s instructions regarding how to handle L.E.W.  They bounced him and tried to walk around with him, even though Rial had told them that L.E.W. was hurt and needed to be still.  Consequently, L.E.W. screamed and cried during their visits.  

B. Compliance with Service Plan

1. From CPS’s Viewpoint

a. Julianne Sweeney

Julianne Sweeney testified that she was an ongoing CPS caseworker in 2006 and that she received L.E.W.’s case from Rial.  Sweeney met with Alisha and explained the initial service plan, which required her to attend parenting classes, submit to drug assessments through CATS, complete random urinalyses, complete a psychological evaluation with Deer Oaks, participate in weekly visitation, obtain and maintain appropriate housing, develop a positive support system with adults, and maintain contact with her (Sweeney).  Alisha indicated that she understood what she was being asked to do and that she was willing to follow through with the services if Sweeney set them up.
(footnote: 4) 

Alisha took the psychological evaluation at Deer Oaks, and it revealed that she needed individual counseling.  Based on the results of her psychological evaluation, Sweeney set up individual counseling for Alisha at Positive Influences in Fort Worth.  Alisha attended three sessions, missed the next six sessions, and was dropped from Positive Influences, which meant that she could not attend the parenting classes offered there.  Alisha explained her absences to Sweeney by stating that she did not have transportation to Positive Influences in Fort Worth.  Sweeney admitted that it was not reasonable for her to schedule therapy twenty miles from Alisha when she knew that Alisha did not have transportation, but Sweeney stated that Positive Influences was the only alternative CPS had because it was the closest contract.  Sweeney also testified that Alisha’s visitations with L.E.W. were in Fort Worth, so it was plausible to think that she could attend counseling in Fort Worth as well.  Alisha ultimately completed the parenting classes offered through her high school. 

Sweeney tried to set up a hair follicle test for the drug assessment, but Alisha did not follow through with the test.  Alisha later told Sweeney that she had misunderstood the drug testing facility’s hours of operation and could not get transportation in time to make it to the test.  Sweeney set up a second test for Alisha, and she failed to show up a second time.  

For the most part, Alisha attended the weekly visitations and only missed a handful due to transportation issues.  Sweeney attended three or four of the visits and was concerned that Alisha fed L.E.W. junk food, which he threw up when he returned to his foster home.  Based on her observations during Alisha’s visits, Sweeney concluded that Alisha had failed to demonstrate appropriate parenting skills and did not understand the needs of a six-month-old baby. 

Because Sweeney was concerned that Alisha was not making appropriate progress that would enable her to recommend that L.E.W. be returned to her, Sweeney had a conversation with Alisha and her attorney regarding what was required of Alisha under the service plan.  Sweeney relayed to Alisha that it was very important for her to attend therapy and parenting classes, to take the urinalyses, and to explain exactly what had happened to L.E.W.  Sweeney denied telling Alisha that she would place L.E.W. with her in exchange for an affidavit describing how L.E.W.’s injuries had occurred and for Alisha’s participation in therapy; instead, Sweeney said that she had told Alisha that doing these two things would give her an advantage in getting L.E.W. back. 

Consequently, on May 23, 2006, Alisha drafted an affidavit that stated:

One night, [L.E.W.’s] father James and I were having an argument.  We were angry with each other and were screaming and pushing each other.  James said he was going to leave and he picked up [L.E.W.] and he then began packing his suitcase, so then I picked up [L.E.W.] because James was going to take him away.  I was holding [L.E.W.] around his torso and tried to hold him too tight to me.  Then James tried to grab him.  We were pulling, but I was crying and [L.E.W.] was, too, so I let go because I didn’t want him to cry or be hurt.  We never meant to hurt him, and we’re both really sorry.  I had no idea that we could hurt our baby so easily.  We’re very embarrassed that we hurt our baby while being selfish and immature, and we promise to do whatever we can to get another chance to raise [L.E.W.].  I love him more than anything in the [world] and will do anything and everything within my power to protect him forever. 

Alisha stated that she believed that L.E.W.’s injuries occurred during that fight.  Alisha also said that L.E.W. was taking a nap on James’s chest while James was on the couch and that L.E.W. fell onto the floor.  Sweeney, however, did not believe that Alisha’s affidavit or the fall from James’s chest explained L.E.W.’s spiral leg fracture; medical personnel and L.E.W.’s medical records indicated that L.E.W. had been injured numerous times. 

Before Sweeney left CPS, she said that she could not recommend that L.E.W. be returned to Alisha.  Sweeney testified that she was concerned that Alisha had not participated in enough therapy classes to address the Texas Department of Family and Protective Service’s (TDFPS) concerns about her ability to care for L.E.W., that Alisha had called and asked to come to Sweeney’s office several times but never came, that there were conflicting stories about L.E.W.’s injuries, and that Alisha appeared to be very “high-functioning” but did not appear to understand the seriousness of the situation.  At the time that Sweeney transferred the case to Courtney Garrison, Sweeney opined that Alisha was not in a position to independently take care of herself, let alone a child. 

b. Anna Lopez

Anna Lopez testified that she is employed by CPS and was the case aide who supervised Alisha’s visitations with L.E.W.  Lopez said that Alisha missed approximately three visits during fifteen months of visitation. 

During the initial visitations, L.E.W. slept or cried if he was awake.  As he got older, he started to cry a distressed cry as soon as he saw Lopez’s car because he did not want to leave his babysitter and come to the visits.  L.E.W. cried for at least part of each visitation during the first twelve months of visits.  Lopez showed Alisha how to comfort L.E.W. by swaddling him and holding him close.  At times, Alisha followed Lopez’s instructions, and other times she resented Lopez’s telling her what to do.

During the most recent three visits, L.E.W. walked over to Alisha and handled the visits well, but he still cried when Lopez picked him up to drive him to the visitations.  Lopez noticed that Alisha’s ability to interact with the child had improved over the past three weeks:  Alisha got down on the floor and played with L.E.W. and read to him.  

Lopez testified that L.E.W. does not show any separation anxiety; he holds Lopez’s hand, tells Alisha goodbye, and runs down the hall.  Lopez noticed, however, that L.E.W. interacts differently with his foster mother versus Alisha.  L.E.W. would run to his foster mother and hold out his arms so that she could pick him up, indicating that he was ready to go with her.  Lopez did not observe L.E.W. exhibit any distress when his foster mother was present.  

c. Courtney Garrison

Courtney Garrison testified that she is the current ongoing caseworker for L.E.W. and that she had received the case from Sweeney.  At the time that Garrison received the case, Alisha was not complying with the service plan. 

Garrison agreed that Alisha had completed parenting classes and her psychological evaluation, had participated in counseling, and had taken a random drug test that was negative.  Garrison testified, however, that Alisha did not provide any information indicating that she is capable of supporting and providing for herself.  At a previous hearing, Alisha said that she was living with a friend, but she had not disclosed the friend’s address to Garrison.  And 
although 
Garrison had learned in March that Alisha had a new job, Alisha failed to provide information to Garrison so that she could verify Alisha’s employment. 

Garrison recommended that the trial court terminate Alisha’s parental rights to L.E.W. and asked that TDFPS be named as permanent managing conservator for L.E.W.  Garrison said that she believed termination was in L.E.W.’s best interest because he is not bonded to Alisha and would find it traumatic to be sent to live with her.  

2. From Alisha’s Viewpoint

Alisha testified that she has tried to work her service plan by submitting to a drug test, by taking the psychological evaluation, by graduating from high school, by maintaining employment for the previous five months, by completing parenting classes, and by arranging to meet with a therapist.  She admitted, however, that she had failed to attend some of her counseling sessions and had been discharged from Positive Influences.  Alisha also admitted that she had failed to provide her caseworker with the required documentation to prove that she was employed.  When Alisha was asked where L.E.W. would live if he went home with her, she testified that he would live in her room at her cousin’s house.  Alisha said that she provided her cousin’s address to her caseworker the week before trial but admitted that she had not provided her caseworker with any information or documentation regarding the type of home environment that she could provide. 

Alisha also testified that she loves her son very much and is more than ready for him to come home.  She said that James is incarcerated, that she no longer considers him her boyfriend, and that she has not talked to him since he has been in jail.  Alisha said that she has matured, that she has a job, and that she has succeeded with most of her goals.  She testified that she will be a great parent to L.E.W., that she will provide safety and “everything he needs,” and that she will help him learn new things and be there to watch him. 

C. L.E.W.’s Life in Foster Care

Felicia Golston, L.E.W.’s foster mother, testified that when L.E.W. was first placed in her home, he was in a lot of pain and was running a fever.  She took him to the doctor shortly thereafter, and the doctor told her that L.E.W. possibly had pneumonia.  She said that L.E.W. slept in his carrier because it appeared that his ribs hurt if he laid on a bed. 

According to Golston, L.E.W. has continued to grow and thrive while in foster care.  Golston described L.E.W. as very playful, intelligent, exploratory, athletic, and friendly.  His speech has become very clear, he remembers things, he is able to get things for himself, and he is able to feed himself.  He has not had any other broken bones while in foster care.

After each visitation, Golston noticed that it took L.E.W. a while to smile and coo again, which he had been doing prior to the visitation.  Golston said that L.E.W. had nightmares when he went to bed after a visitation and that he continued to have nightmares after the visits in the weeks preceding the trial. 

Golston stated that she has become attached and bonded with L.E.W. and that she believes that he has attached and bonded with her family.  Golston testified that she would adopt L.E.W. if his parents’ parental rights were terminated and that she believes she would be able to offer him the safety, security, and stability that he would need. 

D. Disposition

After hearing the above evidence, as well as testimony from Alisha’s father, mother, and step-father that Alisha is responsible and would provide for and protect L.E.W., the trial court told Alisha:

I’m glad to hear that you have made some progress in your life, and I hope you’ll continue working to make progress in your life.  You have great potential, and I hope that you’ll do that.  But my decision today is not what’s best for you but what’s best for your child [L.E.W.].

The Court has a number of concerns about this case and about the injuries to your child, and based on the evidence the Court has heard today, the Court’s going to grant the State’s Petition and terminate all the parental rights to this child and place the child in the conservatorship of the Texas Department of Family and Protective Services pending a hopeful adoption for your child.  

Thereafter, the trial court entered an order terminating Alisha’s parental rights to L.E.W.  This appeal followed.

III.  Burden of Proof and Standard of Review

A parent’s rights to “the companionship, care, custody, and management” of her children are constitutional interests “far more precious than any property right.”  
Santosky v. Kramer
, 455 U.S. 745, 758-59, 102 S. Ct. 1388, 1397 (1982); 
In re M.S.
, 115 S.W.3d 534, 547 (Tex. 2003).  
“While parental rights are of constitutional magnitude, they are not absolute.  Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right.”  
In re C.H.
, 89 S.W.3d 17, 26 (Tex. 2002).
  In a termination case, the State seeks not just to limit parental rights but to end them permanently—to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except for the child’s right to inherit.  T
EX
. F
AM
. C
ODE
 A
NN
. § 161.206(b) (Vernon Supp. 2007); 
Holick v. Smith
, 685 S.W.2d 18, 20 (Tex. 1985).  We strictly scrutinize termination proceedings and strictly construe involuntary termination statutes in favor of the parent.  
Holick
, 685 S.W.2d at 20-21;
 In re E.M.N.
, 221 S.W.3d 815, 820 (Tex. App.—Fort Worth 2007, no pet.).

In proceedings to terminate the parent-child relationship brought under section 161.001 of the family code, the petitioner must establish one ground listed under subdivision (1) of the statute and must also prove that termination is in the best interest of the child.  T
EX.
 F
AM.
 C
ODE
 A
NN.
 § 161.001 (Vernon Supp. 2007); 
In re J.L.
, 163 S.W.3d 79, 84 (Tex. 2005).  Both elements must be established; termination may not be based solely on the best interest of the child as determined by the trier of fact.  
Tex. Dep’t of Human Servs. v. Boyd
, 727 S.W.2d 531, 533 (Tex. 1987).
 

Termination of parental rights is a drastic remedy and is of such weight and gravity that due process requires the petitioner to justify termination by clear and convincing evidence.  T
EX
. F
AM
. C
ODE
 A
NN
. §§ 161.001, 161.206(a); 
In re J.F.C.
, 96 S.W.3d 256, 263 (Tex. 2002).  This intermediate standard falls between the preponderance standard of ordinary civil proceedings and the reasonable doubt standard of criminal proceedings. 
 
In re G.M.
, 596 S.W.2d 846, 847 (Tex. 1980); 
In re C.S.
, 208 S.W.3d 77, 83 (Tex. App.—Fort Worth 2006, pet. denied).  It is defined as the “measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established.”  
Tex. Fam. Code Ann.
 § 101.007 (Vernon 2002)
.

Accordingly, 
in reviewing the evidence for legal sufficiency in parental termination cases, we must determine whether the evidence is such that a fact-finder could reasonably form a firm belief or conviction that the grounds for termination were proven.  
In re J.P.B.
, 180 S.W.3d 570, 573 (Tex. 2005).  We must review all the evidence in the light most favorable to the finding and judgment.  
Id.
  This means that we must assume that the fact-finder resolved any disputed facts in favor of its finding if a reasonable fact-finder could have done so.  
Id.
  We must also disregard all evidence that a reasonable fact-finder could have disbelieved.  
Id.
  We must consider, however, undisputed evidence even if it is contrary to the finding.  
Id.
  That is, we must consider evidence favorable to termination if a reasonable fact-finder could, and disregard contrary evidence unless a reasonable fact-finder could not.  
Id.

We must therefore consider all of the evidence, not just that which favors the verdict.
  Id. 
 But we cannot weigh witness credibility issues that depend on the appearance and demeanor of the witnesses, for that is the fact-finder’s province.  
Id. 
at 573, 574.  And even when credibility issues appear in the appellate record, we must defer to the fact-finder’s
 
determinations as long as they are not unreasonable.  
Id. 
at 573.

IV.  Legally Sufficient Evidence Regarding Endangering Course of Conduct

In her first point, Alisha challenges the legal sufficiency of the evidence to support the trial court’s findings under family code section 161.001(1)(D) and (E).  Specifically, Alisha contends that the evidence is legally insufficient to prove that she knowingly placed or knowingly allowed L.E.W. to remain in conditions or surroundings that endangered his physical or emotional well-being or that she engaged in conduct or knowingly placed L.E.W. with persons who engaged in conduct that endangered L.E.W.’s physical or emotional well-being.

Under section 161.001(1)(E), the relevant inquiry is whether evidence exists that the endangerment of the child’s physical or emotional well-being was the direct result of the parent’s conduct, including acts, omissions, or failures to act.  
In re J.T.G.
, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.)
;
 
see
 Tex. Fam. Code Ann. 
§ 161.001(1)(E).  Endangerment means to expose to loss or injury, to jeopardize.  
Boyd
, 727 S.W.2d at 533; 
J.T.G.
, 121 S.W.3d at 125; 
see also In re M.C.
, 917 S.W.2d 268, 269 (Tex. 1996). 
 Additionally, termination under section 161.001(1)(E) must be based on more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required.  
J.T.G.
, 121 S.W.3d at 125
;
 
see
 Tex. Fam. Code Ann. 
§ 161.001(1)(E).  

However, it is not necessary that the parent’s conduct be directed at the child or that the child actually suffer injury. 
 Boyd
, 727 S.W.2d at 533; 
J.T.G.
, 121 S.W.3d at 125.  The specific danger to the child’s well-being may be inferred from parental misconduct standing alone.  
Boyd
, 727 S.W.2d at 533; 
In re R.W.
, 129 S.W.3d 732, 738 (Tex. App.—Fort Worth 2004, pet. denied).   Stability and permanence are paramount in the upbringing of a child.
  See In re T.D.C.
, 91 S.W.3d 865, 873 (Tex. App.—Fort Worth 2002, pet. denied).  A fact-finder may infer from past conduct endangering the well-being of the child that similar conduct will recur if the child is returned to the parent.
  See In re D.L.N.
, 958 S.W.2d 934, 941 (Tex. App.—Waco 1997, pet. denied), 
disapproved on other grounds by
 
J.F.C.
, 96 S.W.3d at 256, and 
C.H.
, 89 S.W.3d at 17.

Here, medical evidence revealed that four-month-old L.E.W. had six fractured ribs and a spiral fracture in his right leg.  His injuries varied in age from seven to ten to fourteen days prior to his hospital visits.  The seven- to fourteen-day time frame of L.E.W.’s injuries would place them during the time that Alisha would have been on Christmas break, meaning that she would have been the primary caregiver for L.E.W. when his injuries occurred.  Alisha testified that she and L.E.W. spent lots of time during the holidays with James, who had admitted that he, as well as his brothers, had anger management problems and that he had been involved in and arrested for fighting.

Despite the symptoms that L.E.W. displayed as a result of his injuries, Alisha failed to seek immediate medical treatment for L.E.W.  Although Alisha noticed on Saturday, December 31 that L.E.W. had been exceptionally fussy and that his ribs “felt funny,” she waited three days before seeking medical attention for him.

Moreover, during the CPS investigation following L.E.W.’s visits to USMD and Cook Children’s, Alisha withheld information from the doctors, the police detective, and the CPS caseworkers regarding how L.E.W.’s injuries were inflicted.  Alisha’s failure to inform the doctors about how L.E.W. had been injured hindered them in treating L.E.W.; L.E.W.’s spiral leg fracture was not diagnosed until his second trip to the hospital.  When Alisha finally came forward—over five and a half months after L.E.W.’s trips to the hospitals—with an affidavit describing how she had tightly held L.E.W. around his torso during a tug-of-war with James, it was still unclear how L.E.W.’s leg and his right rib were broken because those fractures were in a later stage of healing, indicating that they had been inflicted prior to the left-side broken ribs.  L.E.W.’s young age prevented him from explaining how he had been hurt and also prevented him from defending himself and attempting to avoid the injuries.  Furthermore, although Alisha stated that she never meant to hurt L.E.W., that she was “really sorry,” and that she “had no idea that [she] could hurt [her] baby so easily,” it was within the fact-finder’s province to 
weigh her credibility.

We have carefully reviewed the entire record.  Looking at all the evidence in the light most favorable to the trial court’s finding, we hold that a reasonable trier of fact could have formed a firm belief or conviction that 
Alisha engaged in conduct or knowingly placed L.E.W. with people who engaged in conduct that endangered his physical or emotional well-being.  
See 
Tex. Fam. Code Ann.
 § 161.001(1)(E);
 Castaneda v. Tex. Dep’t of Protective & Regulatory Servs.
, 148 S.W.3d 509, 524-26 (Tex. App.—El Paso 2004, pet. denied) (holding evidence legally sufficient to support finding of endangerment and to terminate both parents’ parental rights because father was found to have inflicted four-and-a-half-month-old baby’s rib fractures, leg fractures, and clavical fracture, 
and mother continued to leave baby with father despite telling others that father was too rough with baby).  Accordingly, we hold that the evidence is legally sufficient to support the trial court’s finding of endangerment under subsection (E), which includes both acts and omissions.  We overrule Alisha’s first point.

V.  Termination Was In L.E.W.’s Best Interest

In her second point, Alisha argues that the evidence is factually insufficient to support the trial court’s finding that termination of her parental rights was in L.E.W.’s best interest.  TDFPS argues that there is ample evidence to support the trial court’s “best interest” finding.
 

In reviewing the evidence for factual sufficiency, we must give due deference to the fact-finder’s
 
findings and not supplant the judgment 
with our own.  
In re H.R.M.
, 209 S.W.3d 105, 108 (Tex. 2006)
.  We must determine whether, on the entire record, a fact-finder could reasonably form a firm conviction or belief that the termination of the parent’s parental rights would be in the best interest of the child.  
C.H.
, 89 S.W.3d at 28.
  
If, in light of the entire record, the disputed evidence that a reasonable fact-finder could not have credited in favor of the finding is so significant that a fact-finder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient.  
H.R.M.
, 209 S.W.3d at 108. 
 Prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest.
  Tex. Fam. Code Ann. 
§ 263.307(a) (Vernon 2002).  There is also a strong presumption that keeping a child with a parent is in the child’s best interest
.  In re R.R.
, 209 S.W.3d 112, 116 (Tex. 2006).  Nonexclusive factors that the trier of fact in a termination case may use in determining the best interest of the child include (1) the desires of the child,

(2) the emotional and physical needs of the child now and in the future, (3) the emotional and physical danger to the child now and in the future, (4) the parental abilities of the individuals seeking custody, (5) the programs available to assist these individuals to promote the best interest of the child, (6) the plans for the child by these individuals or by the agency seeking custody, (7) the stability of the home or proposed placement, (8) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one, and (9) any excuse for the acts or omissions of the parent.
  Holley v. Adams
, 544 S.W.2d 367, 371–72 (Tex. 1976). 

These factors are not exhaustive; some listed factors may be inapplicable to some cases; other factors not on the list may also be considered when appropriate.  
C.H
., 89 S.W.3d at 27.  Furthermore, undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the best interest of the child.  
Id.
  On the other hand, the presence of scant evidence relevant to each factor will not support such a finding.  
Id.

L.E.W. was only nineteen months old at the time of trial and was unable to express his desires.  However, testimony from Garrison revealed that L.E.W. is not bonded to Alisha and that it would be traumatic for him to be sent to live with her.  For instance, the record revealed that L.E.W. interacted differently with Alisha versus Golston; L.E.W. cried during visits with Alisha and had nightmares after the visitations.  At the conclusion of the visits, L.E.W. had no trouble leaving Alisha and would run over to Golston, hold out his arms, and eagerly wait for her to pick him up.  Garrison testified that there is a bond between Golston and L.E.W. because he has grown up in her house, and Golston confirmed that L.E.W. has bonded with her. 

The record did not reveal that L.E.W. had any special physical and emotional needs.  The evidence demonstrated that L.E.W. had healed from his injuries and had not received any injuries while in foster care.  Sweeney indicated that L.E.W. had made a great deal of progress and was thriving in his foster home.  Golston echoed Sweeney’s testimony that L.E.W. was thriving in her home and described L.E.W. as very playful, intelligent, exploratory, athletic, and friendly.  Golston said that L.E.W.’s speech has become very clear, he remembers things, he is able to get things for himself, and he is able to feed himself. 

The endangering course of conduct discussion above addressed the present and future physical and emotional dangers to L.E.W.  Additionally, the record demonstrated that Alisha did not know how to care for L.E.W.  Alisha, in her affidavit, stated that she did not know that the tug-of-war could hurt L.E.W.  During the visitations, she failed to follow the caseworker’s instructions and handled L.E.W. carelessly despite that it was obvious that he was in pain and was continuing to heal from his rib fractures.  Also during the visits, Alisha fed L.E.W. junk food, which made him throw up.  Moreover, Alisha failed to present any evidence establishing the type of home environment that she could provide for L.E.W.  She also did not disclose where she was working or who would care for L.E.W. while she was at work, which begged the question of whether she would leave him with someone who may have harmed him in the past.  The visits that Alisha did have with L.E.W. showed that she lacked knowledge of what was appropriate to feed him and how to comfort him.  Therefore, TDFPS’s plan for L.E.W. included terminating Alisha’s parental rights and placing L.E.W. for adoption with his foster parent, which would provide a safe environment and permanency. 

Giving due consideration to evidence that the fact-finder could have found to be clear and convincing, and based on our review of the entire record, we hold that a reasonable trier of fact could have formed a firm belief or conviction that termination of Alisha’s parental rights would be in L.E.W.’s best interest.  
See Castaneda
, 148 S.W.3d at 524-26 (holding evidence factually sufficient to support finding that terminating 
parental rights was in child’s best interest where child had received numerous fractures, including rib fractures and a tibia fracture, that were caused by physical abuse).  Accordingly, we hold that the evidence is factually sufficient to support the trial court’s best interest finding.  We overrule Alisha’s second point.

VI.  Conclusion

Having overruled both of Alisha’s points, we affirm the trial court’s order terminating Alisha’s parental rights to L.E.W. 

PER CURIAM

PANEL F: WALKER, J.; CAYCE, C.J.; and MCCOY, J.

DELIVERED: December 13, 2007

FOOTNOTES
1:
See
 
Tex. R. App. P.
 47.4.

2:
The trial court also terminated the parental rights of L.E.W.’s father, James W., but he did not appeal. 

3:
Rial did not explain how Detective Hubbard had previously observed the bed in question.

4:
Because James did not appeal the termination of his parental rights, our analysis will focus on Alisha’s compliance with the service plan.